**SHAWNEE COAL COMPANY,**
**Plaintiff-Appellee,**

v.

**Cecil D. ANDRUS, Secretary of the Interior, et al., Defendants-Appellants.**

**No. 80–3220.**

United States Court of Appeals,
Sixth Circuit.

Argued June 8, 1981.

Decided Oct. 5, 1981.

James E. Rattan, Asst. U. S. Atty., Columbus, Ohio, Nancy B. Firestone, Michael A. McCord, James W. Moorman, Dept. of Justice, Land Division, Washington, D. C., for defendants-appellants.

C. William O'Neill, Thomas B. Ridgley, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for plaintiff-appellee.

Before ENGEL and JONES, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

The issue in this case is whether the district court erred in asserting jurisdiction over an action to enjoin the Secretary of the Interior from enforcing certain provisions of the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201, et seq. In response to the Secretary's issuance of cessation orders against its tippling operations and without exhausting administrative remedies, Shawnee Coal Co. sought an injunction and declaratory relief in the district court to prohibit the Secretary from taking any action to enforce the administrative orders. After concluding that Sections 525 and 526 of the Act, 30 U.S.C. §§ 1275 and 1276, provide a parallel structure for review by the Secretary or in a district court, the court assumed jurisdiction and concluded that Shawnee had satisfied the traditional standards for the issuance of injunctive relief. Accordingly, the court enjoined enforcement of the cessation orders. We now reverse.

## I.

## BACKGROUND

The Surface Mining Act is a comprehensive statute designed to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." § 102(a), 30 U.S.C. § 1202(a). Title II of the Act creates the Office of Surface Mining Reclamation and Enforcement (OSM) within the Department of the Interior, and the Secretary of the Interior, acting through OSM, is charged with the primary responsibility for administering and implementing the Act. § 201, 30 U.S.C. § 1211.

The Act's principal regulatory and enforcement provisions are contained in Title V, which establishes a two-tiered regulatory program to achieve the purposes of the statute. The two tiers consist of an interim regulatory program and a permanent regulatory program. § 501(a) of the Act, 30 U.S.C. § 1251(a), requires the Secretary to promulgate interim regulations for surface coal mining and reclamation operations within ninety days of the statute's enactment. After a notice and comment period, the Secretary promulgated and published final interim regulations on December 13 and 16, 1977, and the interim regulations were made effective as of those dates.

§ 502(c) of the Act, 30 U.S.C. § 1252(c), delineates the performance standards that the interim regulatory program must contain. Those performance standards include, among other things, requirements for restoration of land to its prior condition after mining, restoration of land to its approximate original contours, segregation and preservation of topsoil, minimization of hydrologic disturbances from mining, construction of coal mine waste piles used as dams or embankments, utilization of explosives, revegetation of mined areas, reclamation of mountaintop mines, and soil disposal for steep-sloped mines. See §§ 515(b)(2), (3), (5), (10), (13), (15), (19), 515(c), and 515(d), 30 U.S.C. §§ 1265(b)(2), (3), (5), (10), (13), (15), (19), 1265(c), and 1265(d). Surface coal mining operations, excluding those on "Federal lands" or "Indian lands," commencing on or after February 3, 1978 must comply with the provisions of the interim regulatory program when operations start; and surface coal mining operations begun before that date are required to adhere to the interim regulations by May 3, 1978. §§ 502(b), (c) and 701(11), 30 U.S.C. §§ 1252(b), (c) and 1291(11). By February 3, 1978, the Secretary is required to implement a federal enforcement and inspection program in each state, including the examination of surface coal mines by a federal

inspector once every six months. § 502(e), 30 U.S.C. § 1252(e). During the interim phase, the Secretary and the states share responsibility for enforcement of the regulatory program with the primary responsibility resting with the Secretary. The statute contemplates that the Secretary will not issue mining permits during the interim phase, but the states may continue to issue mining permits so long as the permits mandate compliance with the requisite performance standards. § 502(b), 30 U.S.C. § 1252(b). The Secretary has the authority, however, to inspect mine sites and order the correction of any violation by action "to be implemented pursuant to the federal enforcement provisions of this title." § 502(e)(1), 30 U.S.C. § 1252(e)(1). The "federal enforcement provisions" are the notice of violation provisions and cessation order provisions of § 521, 30 U.S.C. § 1271, and the civil penalty provisions of § 518, 30 U.S.C. § 1268.

The second tier of regulation contemplated by the Surface Mining Act, the permanent phase, is provided for in § 501(b), 30 U.S.C. § 1251(b), which commands the Secretary to promulgate, within one year of the statute's enactment, a permanent regulatory program establishing procedures and requirements for preparation, submission, and approval of "State programs" and for development and implementation of "Federal programs." In the event a State program is not approved, the Secretary must then implement a "Federal program" within that state. § 504(a), 30 U.S.C. § 1254(a).[1] In addition, the permanent regulations must require adherence to all provisions of Title V of the Surface Mining Act, including all the performance standards set forth in § 515, 30 U.S.C. § 1265, and not just those applicable to the interim regulatory program pursuant to § 502(c), 30 U.S.C. § 1252(c). § 501(b), 30 U.S.C. § 1251(b).

During the permanent phase, a state may seek to assume primary jurisdiction over the regulation of surface coal mining on "non-Federal lands" within its borders by submitting a proposed "State program" of regulation to the Secretary. § 503(a), 30 U.S.C. § 1253(a). The Secretary must approve or disapprove a proposed "State program," in whole or in part, within six months after the program is submitted to him. § 503(b), 30 U.S.C. § 1253(b). If a "State program" is approved by the Secretary, that state assumes the responsibility for issuing mining permits and for enforcing the provisions of its regulatory program. However, if a state fails to submit a proposed program, fails to resubmit an acceptable program within sixty days after disapproval of its proposed program, or at any time fails to implement, enforce, or maintain an approved program in accordance with the Act, the Secretary is directed to prepare and implement a "Federal program" or regulation within that state no later than June 3, 1980. § 504(a), 30 U.S.C. § 1254(a). When a "Federal program" is promulgated for a state, the Secretary constitutes the regulatory authority administering the Act within that state and continues as such until a "State program" is approved. No later than eight months after approval of a "State program" or implementation of a "Federal program," all surface coal mining and reclamation operations on "non-Federal lands" within the state must obtain a new permit issued in accordance with the applicable regulatory program. § 506(a), 30 U.S.C. § 1256(a).

Under § 521(a)(2), 30 U.S.C. § 1271(a)(2), if an inspector determines that a violation of the Act or any permit condition creates an imminent danger to the public health or safety or can reasonably be expected to cause significant imminent environmental harm to land, air or water resources, the inspector must order an immediate halt to the mining operation or the portion thereof contributing to the danger. Under § 521(a)(3), if the inspector determines that there is a violation of the Act or the permit, but that there is no imminent danger to health, safety or the environment, the in-

---

1. At the time of this litigation the State of Ohio had submitted a proposed state program to the Secretary of the Interior for approval, but the Secretary had not yet acted on that proposal. Thus, the interim regulatory program was in effect.

spector must issue a notice of violation, allowing the operator up to 90 days to correct the condition. In the event the violation is not corrected within that time, the inspector must immediately order a cessation of the mining operation or the portion thereof relevant to the violation. The cessation order must outline the steps necessary to correct the violation. Finally, under § 521(a)(4), if the inspector determines that a permittee has committed a pattern of violations, the inspector must issue an order to show cause why the permit should not be suspended or revoked.

Under § 518, 30 U.S.C. § 1268, once the operator has been charged with a violation, the Secretary has 30 days in which to determine whether to assess a civil penalty and to inform the operator of the amount of the proposed penalty. If a cessation order is issued, however, a civil penalty must be assessed. § 518(a), 30 U.S.C. § 1268(a). Where an operator is issued a notice of violation and fails to correct the condition within the period prescribed for its correction, a civil penalty of not less than $750.00 per day must be assessed for each day the violation continues unabated. § 518(h), 30 U.S.C. § 1268(h).

Section 525 of the Act, 30 U.S.C. § 1275, provides that a person adversely affected by a notice or order may apply for administrative review by the Secretary of the Interior. Where the application for review involves a cessation order under § 521(a)(2) or (3), the Secretary must issue his written decision within 30 days of receipt of the application. In addition to this formal review procedure, an operator may also simultaneously seek informal review of any notice or order requiring cessation of mining activities pursuant to § 521(a)(5). That subsection provides that any such notice or order will automatically expire within 30 days "unless a public hearing is held at the site or within such reasonable proximity to the site that any viewings of the site can be conducted during the course of public hearing."

An operator may also apply to the Secretary for temporary relief from any notice or order. The Secretary may grant such temporary relief if there is a substantial likelihood that the applicant will prevail on the merits, and the relief will not adversely affect the public health or safety or cause significant, imminent environmental harm. § 525(c), 30 U.S.C. § 1275(c). When the applicant requests temporary relief from a cessation order, the Secretary must rule on the request within five days.

If temporary relief from a cessation order is denied by the Secretary, the applicant may seek immediate review directly in the United States District Court for the district in which the surface mine is located. § 526(c), 30 U.S.C. § 1276(c). In addition, the applicant may bypass the Interior Board of Surface Mining Appeals, 43 C.F.R. 4.1267. Under § 526(c), the district court may then grant temporary relief pending completion of the administrative process. Temporary relief under § 526(c) may be granted where the applicant can show that he has a substantial likelihood of success on the merits and that such relief will not adversely affect the public health, safety or the environment. If temporary relief is granted by either the Secretary under § 525(c) or the district court under § 526(c), the operator will not be assessed any penalty under § 518(h) (for failing to correct the violation) until a final order is issued by the Secretary after the administrative review process is completed. § 518(h), 30 U.S.C. § 1268(h). Once the administrative process is completed and a final order is issued by the Secretary, the district court, upon application, may review the Secretary's final decision "on the record" made before the Secretary. § 526(b), 30 U.S.C. § 1276(b).

### B.

Pursuant to a mining permit issued by the State of Ohio, Shawnee Coal Co. operated a surface coal mine in Perry County, Ohio, until December, 1978. At the same site Shawnee operated a coal tipple—a processing operation consisting of machinery that crushed and prepared coal for transport. Although Shawnee terminated its mining operations at the site relevant here

in December, 1978, it continued to operate the tipple to process coal removed from the Shawnee mine, and also from other mines owned or leased by the President of Shawnee, James Graham. The tippling operation requires that the coal be stored in piles both before and after processing. Graham admitted at the hearing for a preliminary injunction that toxic runoff from these coal piles exists.

On September 5, 1979, federal mine inspectors from the Interior Department's Office of Surface Mining Reclamation and Enforcement inspected the Shawnee mine site and tipple operation. That inspection led to the issuance of notices of four violations of the Act.[2] In their final form the notices charged Shawnee with operating a surface mining operation within 100 feet of a road and with failing to meet certain water quality standards in the effluent discharge leaving the tipple site area. Under the notices Shawnee was to abate the violations by November 5, 1979. This period was subsequently extended until December 5, 1979, giving Shawnee the full 90 days permitted under the Act for abating the violations. After that period, § 518(h) of the Act, 30 U.S.C. § 1268(h) would require that Shawnee, as an operator who has failed to abate the violations, be assessed a minimum civil penalty of $750.00 per day for each day the violations remained unabated.

The Act also provides that the violations notices specify the measures necessary for abating the violations and the procedures necessary for obtaining administrative review of the notices. *See* 30 U.S.C. § 1271(a)(3). The Secretary's representatives suggested the installation of sedimentation ponds and treatment facilities to abate the water quality violations.[3] At Shawnee's request, a conference was scheduled for November 28, 1979, for the parties to review the notices of violations and the abatement efforts made by Shawnee. The conference was followed by negotiations in which Shawnee's officers maintained that the company considered the Secretary's proposals unfeasible and that it could only abate the water quality violations by ceasing operations. Another meeting was conducted on December 10, 1979 in which Shawnee's representatives reiterated their conclusions and requested alternative solutions.[4]

The Shawnee tipple was reinspected on December 13, 1979 and cessation orders issued for the same violations noticed in Sep-

2. The notices were issued pursuant to §§ 521(a)(3) and 522(e)(4) of the Act, 30 U.S.C. §§ 1271(a)(3) and 1272(e)(4). The notices cited the following violations and required that the following steps be taken:

"1. Violation of (§ 1272(e)(4))
Remove coal mines and sediment from (within 100 feet of) S.R. 155 feet drainage ditch between C.R. 44 and TWP RD 275 and either; (2) pull back all operations beyond 100 feet . . . or obtain permission from State of Ohio.
2. Violation of § 715.17(a) of Federal Interim Regulations
Pass all drainage . . . through a sedimentation pond or series of sedimentation ponds before leaving permit area.
3. Violation of § 715.17(a) of Federal Interim Regulations
Install . . . facilities to treat any water discharged (which violate certain unspecified effluent limitations)"
4. Violation of § 715.17(1)(4), Federal Interim Regulations
"Failure to construct access and haul roads associated culverts and ditches so as to prevent additional contributions of suspended solids to streamflow or to runoff outside the permit area . . ."
The fourth claimed violation was vacated by the Secretary on December 7, 1979.

3. Shawnee contended that the citation for a § 522(e)(4) violation, (operating a mining facility within 100 feet of a road) was invalid because that section of the Act did not apply to operations, such as Shawnee's, in existence on the effective date of the Act, August 3, 1977. At the district court hearing the Secretary did not challenge this contention.

4. It appears that Shawnee considered the water quality violations impossible to abate because the main water line supplying the Village of Shawnee ran under the only area available for construction of sedimentation ponds and treatment facilities. The water quality problem apparently resulted from the coal fines (an inferior coal product) stored near the tipple; the market for fines was depressed, and the fines would not be removed until at least June, 1980.

tember. The orders directed the cessation of the tipple operation and abatement of the water quality violations in the same manner described in the September 5, 1979 notices. The orders further advised that the mandatory $750.00 per day assessments would begin to accrue commencing December 13, 1979. Also included in the orders was a description of the procedures for obtaining administrative relief from the orders.

Shawnee then filed the instant action on December 19, 1979, in the United States District Court for the Southern District of Ohio, seeking preliminary and permanent injunctive relief against the Secretary's enforcement of the orders. In its complaint Shawnee alleged: 1) that its tipple operation was not covered by the Act because it was no longer affiliated with its coal removal operation; 2) that by imposing the $750.00 per day penalties the Secretary, in effect, was forcing Shawnee to surrender its right to appeal; 3) that the abatement methods required by the Secretary were unreasonable; and 4) that the Secretary's decision to apply the Act to tipples formerly associated with a surface mine but not to tipples operating independently from any surface mine violated Shawnee's equal protection and due process rights. In response to the complaint the district court granted a temporary restraining order on December 19, 1979. On December 26, 1979, the Secretary moved to dismiss the complaint and dissolve the TRO on the grounds that Shawnee had failed to exhaust its administrative remedies. The Secretary argued that before Shawnee could seek relief in a district court, it was required to seek temporary relief from the Secretary under § 525(c) of the Act, 30 U.S.C. § 1275(c).

On December 28, 1979, the district court conducted a hearing on Shawnee's motion for a preliminary injunction. Following the hearing the court granted an injunction enjoining enforcement of the cessation orders against Shawnee until the court rendered a final disposition on the merits of Shawnee's claims. The district court rejected the Secretary's contention that Shawnee had failed to exhaust proscribed administrative remedies. Instead, it held that the Act established alternative avenues for review of administrative orders and that under § 526(c) of the Act, 30 U.S.C. § 1276(c), any order or decision in a civil penalty proceeding was subject to judicial review. The court also considered the present case particularly inappropriate for exhaustion because the central question was one of statutory interpretation concerning the jurisdiction of the Secretary.

In the district court's view, the administrative review provisions of the Act were insufficient to prevent irreparable harm to Shawnee because the Secretary was not required to act for five days and even then the Secretary could render temporary relief only after finding that the public would not suffer any significant harm. Finally, the court concluded that § 10(c) of the Administrative Procedure Act, 5 U.S.C. §§ 704 *et seq.*, permitted judicial review of any final agency action that is not stayed pending appeal within the agency. In summarizing the reasoning underlying its grant of an injunction, the court found that Shawnee was likely to prevail on the merits of its claim that the Secretary had exceeded his authority; that Shawnee would suffer irreparable harm if an injunction did not issue, and that the public interest dictated the issuance of an injunction.[5] The Secretary then filed a timely notice of appeal.

---

5. In considering the issuance of injunctive relief, the district court employed the traditional criteria for such relief, *see Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir. 1977), rather than the specific statutory criteria spelled out in the judicial review provision of the Act. § 526(c), 30 U.S.C. § 1276(c), of the Act sets forth the following prerequisites for temporarily enjoining any order or decision issued by the Secretary:

(1) all parties to the proceedings have been notified and given an opportunity to be heard on a request for temporary relief;

(2) the person requesting such relief shows that there is substantial likelihood that he will prevail on the merits of the final determination of the proceeding; and

(3) such relief will not adversely affect the public health or safety or cause significant

## II.

The only issue with which we must deal is whether the district court had jurisdiction to review and enjoin the Secretary's issuance of cessation orders under the circumstances present here. The relevant provisions of the Act providing for judicial review state in pertinent part:

Section 1276

(a)(2) Any order or decision issued by the Secretary in a civil penalty proceeding or any other proceeding required to be conducted pursuant to Section 554 of Title 5 shall be subject to judicial review on or before 30 days from the date of such order or decision in accordance with subsection (b) of this section in the United States District Court for the district in which the surface coal mining operation is located. * * *

(b) The court shall hear such petition or complaint solely on the record made before the Secretary. Except as provided in subsection (a) of this section, the findings of the Secretary if supported by substantial evidence on the record considered as a whole, shall be conclusive. The court may affirm, vacate, or modify any order or decision or may remand the proceedings to the Secretary for such further action as it may direct.

(c) In the case of a proceeding to review any order or decision issued by the Secretary under this chapter, including an order or decision issued pursuant to subparagraph (c) or (d) of Section 1275 of this title pertaining to any order issued under subparagraph (a)(2), (a)(3), or (a)(4) of Section 1271 of this title for cessation of

coal mining and reclamation operations, the court may, under such conditions as it may prescribe, grant such temporary relief as it deems appropriate pending final determination of the proceedings if—* * *

The district court held that §§ 1275 and 1276 establish "parallel" avenues for review of a cessation order; such an order may be reviewed by either the administrative process (§ 1275), in a district court after exhaustion of administrative remedies (§ 1276(a)(2), (b) or (c)), or in a district court without any exhaustion of administrative remedies (§ 1276(c)). It was this final grant of jurisdiction—§ 1276(c)—which the court below relied upon.

Section 1276(a)(2) clearly provides for judicial review of "any order or decision issued by the Secretary in a civil penalty proceedings," but that review is conditioned upon compliance with the requirements of subsection (b). That subsection provides that a court's review of an order or decision of the Secretary shall be based "solely on the record made before the Secretary" and that "the findings of the Secretary if supported by substantial evidence on the record considered as a whole, shall be conclusive." The Secretary argues that this statutory scheme makes clear that Congress envisioned judicial review "on the record" compiled before the administrative agency.[6] Shawnee contends that the thrust of § 1276(c) is evident from its phraseology: "any order or decision" in a civil penalty provision is subject to judicial review in the district court, thereby permitting immedi-

environmental harm to land, air, or water resources.

The chief difference between these criteria and the traditional standards is that the statute does not specify any consideration of irreparable harm to the plaintiff but rather contains a distinct preoccupation with the public health and environmental consequences. The district court below acknowledged the existence of the statutory criteria but did not explain its reasons, if any, for disregarding them.

In a comparable case, *Virginia Surface Mining and Reclamation Ass'n. v. Andrus*, 604 F.2d 312, 315 (4th Cir. 1979), the court reversed the district court's decision to apply the traditional

criteria rather than the standards expressly provided in the Act. In light of our conclusion, *infra*, that the district court was without jurisdiction here, we do not decide whether the district court committed reversible error by failing to apply the criteria of § 526(c).

6. Unfortunately, the legislative history of the Surface Mining Act offers no insight into the relationship between the Secretary's actions in issuing cessation orders and the scope of district court jurisdiction contemplated by Congress. *See* H.R.Rep.No. 218, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Ad. News 593.

ate review of any cessation order without resort to the temporary relief provisions directed at the Secretary. § 525, 30 U.S.C. § 1275. We find the Secretary's interpretation more persuasive.

In upholding the Act's cessation order and temporary relief provisions against due process challenges, the Supreme Court in *Hodel v. Virginia Surface Mining & Reclamation Ass'n.*, —— U.S. ——, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), stated its understanding of the relationship between administrative action and judicial review:

> A mine operator aggrieved by an immediate cessation order issued under § 521(a)(2) or by a cessation order issued after a notice of violation and expiration of an abatement period under § 521(a)(3) may immediately request temporary relief from the Secretary, and the Secretary must respond to the request within 5 days of its receipt. § 525(c), 30 U.S.C. § 1257. [Sic.] *Section 526(c) of the Act. 30 U.S.C. § 1276(c), authorizes judicial review of a decision by the Secretary denying temporary relief.* In addition, cessation orders are subject to informal administrative review under § 521(a)(5), and formal administrative review, including an adjudicatory hearing, under § 525(b), 30 U.S.C. § 1275(b). The Secretary's decision in the formal review proceeding is subject to judicial review pursuant to § 526(a)(2), 30 U.S.C. § 1276(a).

(footnote omitted) (emphasis added).

This synopsis of the Act accurately describes the function and operation of § 526(c), 30 U.S.C. § 1276. § 526(c) authorizes judicial review when the Secretary has issued an order or decision denying temporary relief from a cessation order issued under § 521(a)(2), (3) or (4), 30 U.S.C. § 1271(a)(2), (3) or (4). It is not, as Shawnee contends, an independent jurisdictional grant permitting intervention by a federal court prior to a party's resort to the admin-

istrative process. Rather, the statute's authorization of judicial review is inextricably intertwined with the administrative review procedures of § 525(c), 30 U.S.C. § 1275(c). This functional aspect of § 526(c) is evident from the structure of the Surface Mining Act.

Section 525 of the Act reflects Congress' desire to assure expeditious review and due process for parties seeking administrative relief of enforcement decisions of the Secretary under the provisions of § 521. It sets forth clear and definitive review procedures for all notices of violation and cessation orders. § 525(a)(1) allows a permitee or person adversely affected by an order of the Secretary to apply to the Secretary for relief, and in that event requires the Secretary to conduct an appropriate investigation. The complaining party is provided a public hearing at which information relating to the notice or order may be presented. After the investigatory process is completed the Secretary must make findings of fact in issuing a written decision. Where the application for review concerns an order for cessation of surface coal mining and reclamation operations, the Secretary is obligated to issue a written decision within thirty days of receipt of the application for review. § 525(b).

Congress recognized that certain circumstances would not permit even so much as a thirty day process. Thus, in § 525(c), it provided for more immediate relief. Pending completion of an investigation by the Secretary, any applicant may petition the Secretary for temporary relief from any order; the Secretary must respond by issuing an order granting or denying relief expeditiously. When the applicant requests relief from any order for cessation of coal mining and reclamation operations, an order responding to the request must be promulgated within five days.[7] In the event

---

7. The district court below concluded that this form of administrative relief was "insufficient" because the Secretary need not act for five days and even then must refuse relief unless it appears that the applicant will prevail on the merits and there will be no significant environ-

mental harm caused by granting the relief. The Supreme Court in *Hodel, supra*, squarely rejected a similar indictment aimed at the adequacy of the administrative relief provisions. After concluding that the statutorily prescribed time was satisfactory, the Court closed with

that the Secretary denies relief, § 526(c) authorizes the district court to grant temporary relief from a cessation order pending completion of the administrative process. Once the administrative process is complete, the Secretary's final order is reviewable "on the record" under §§ 526(a) and (b). To conclude, as did the district court, that a party may seek judicial review of a cessation order under § 526(c) without first attempting to obtain temporary relief from the Secretary pursuant to § 525(c) would render the administrative relief provisions superfluous. Congress would not have imposed such stringent time deadlines on the Secretary if it intended that affected parties would be permitted to bypass an available opportunity to obtain adequate administrative relief from the Secretary.

The logic of the operation of the Act's administrative relief procedures is clear when applied to the cessation orders issued against Shawnee. When the notices of violations were issued on September 5, 1979, Shawnee became entitled to seek administrative review before the Secretary. Had it sought such relief it may well have received a decision on the merits before it was ordered to abate the violations or cease operations. More importantly, had it sought temporary relief under § 525(c) when the cessation orders issued on December 13, 1979, the Secretary would have been forced to grant or deny relief within five days. Thus, Shawnee could have received the relief it ultimately sought, administratively, before it filed this lawsuit on December 19, 1979.

The ready availability of adequate administrative relief also dictates that an aggrieved party exhaust its administrative remedies before procuring judicial review. *Seepe v. Dept. of the Navy*, 518 F.2d 760, 762 (6th Cir. 1975). It is axiomatic that one must exhaust administrative remedies before resorting to judicial review. *FTC v. Standard Oil of California*, 449 U.S. 813, 101 S.Ct. 62, 66 L.Ed.2d 16 (1980); *Myers v.*

*Bethlehem Shipbuilding Co.*, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938); *Robinson v. Dow*, 522 F.2d 855, 857–58 (6th Cir. 1978). The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise and to correct its own errors so as to moot judicial controversies. *Parisi v. Davidson*, 405 U.S. 34, 37, 92 S.Ct. 815, 817, 31 L.Ed.2d 17 (1972). By limiting judicial interruption of agency proceedings, the doctrine also promotes a sensible division of tasks between the agency and the courts: parties are discouraged from weakening the position of the agency by flouting its processes and the courts' resources are reserved for review and resolution of those matters where a dispositive solution is unavailable in the administration process. "Thus, the doctrine serves interests of accuracy, efficiency, agency autonomy and judicial economy." *Ezratty v. Comm. of Puerto Rico*, 648 F.2d 770, 774 (1st Cir. 1981).

In the Surface Mining Act Congress has provided a well-defined administrative system · for resolution of enforcement actions stemming from cessation orders. Given this machinery, we are reluctant to permit a district court to interrupt the Secretary's determinations. Bypassing the administrative remedies would impair the expeditious resolution of disputes and result in the forfeiture of administrative expertise. By circumventing the proscribed procedures, quick resort to the district court could easily preclude the Secretary from building a factual record, from clarifying or narrowing the dispute, or from resolving the controversy altogether so as to obviate the necessity for judicial intervention. Accordingly, we conclude that Shawnee was required to exhaust its administrative remedies by seeking review and relief pursuant to Section 525 before obtaining judicial review under Section 526(c).

Although exhaustion of administrative remedies is typically required as a condition

language equally appropriate here: "In these circumstances, there simply is no basis for the District Court's decision to substitute a judicial

policy preference for the scheme adopted by Congress."

for judicial review, the requirement is not absolute. *See, e. g., White Mountain Broadcasting Co. v. FCC*, 598 F.2d 274, 278 (D.C.Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979). The doctrine must be applied in each case with an understanding of its purposes and the particular administrative scheme involved. *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969). Where pursuit of administrative remedies does not serve the purposes behind the exhaustion doctrine, the courts have allowed a number of exceptions. Thus, exhaustion is not required if administrative remedies are inadequate or not efficacious, *see Humana of South Carolina, Inc. v. Califano*, 590 F.2d 1070, 1081 (D.C.Cir.1978); where pursuit of administrative remedies would be a futile gesture, *see Porter County Chapter of the Izaak Walton League of America, Inc. v. Costle*, 571 F.2d 359, 363 (7th Cir.), *cert. denied*, 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 130 (1978); where irreparable injury will result unless immediate judicial review is permitted, *Rhodes v. United States*, 574 F.2d 1179, 1181 (5th Cir. 1978); or where the administrative proceeding would be void, *see Winterberger v. Teamsters, Local Union 162*, 558 F.2d 923, 925 (9th Cir. 1977).

Another exception to the exhaustion doctrine is that a litigant may bypass available administrative procedures where there is a readily observable usurpation of power not granted to the agency by Congress. *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). Shawnee contends that this exception applies here; regardless of the statutory provisions, exhaustion was not required here because the Secretary's jurisdiction over the tipple operation was challenged.

The *Leedom* jurisdiction exception to the exhaustion doctrine is not automatically invoked whenever a challenge to the scope of an agency's authority is raised. On the contrary, it is a narrow anomaly reserved for extreme situations. *See American General Ins. Co. v. FTC*, 496 F.2d 197, 200 (5th Cir. 1974). Thus, even when the issue of agency jurisdiction is raised, the exhaustion doctrine generally requires that an agency be accorded an opportunity to determine initially whether it has jurisdiction. *West v. Bergland*, 611 F.2d 710, 719 (8th Cir. 1979), *cert. denied*, 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980); *Marshall v. Burlington Northern Inc.*, 595 F.2d 511, 513 (9th Cir. 1979); *In re Restland Memorial Park*, 540 F.2d 626, 628 (3rd Cir. 1976); *Casey v. FTC*, 578 F.2d 793, 798 (9th Cir. 1978); cf. *United States v. City of Painesville, Ohio*, 644 F.2d 1186, 1190 (6th Cir. 1981) (agency's interpretation of its own regulations is controlling unless plainly erroneous). *See also Public Lands Institute, Inc. v. Andrus*, 497 F.Supp. 482, 486 (D.C.C. 1980).

In many circumstances it is easier to theorize than to discern when an agency's action is so far out of bounds, so beyond the realm of its delegated authority that the *Leedom* exception should be invoked. In grappling with this problem the courts have employed three criteria for determining whether the exhaustion requirement should be waived: 1) is the agency's jurisdiction conspicuously lacking; 2) will the agency's expertise assist in resolving the jurisdictional issue; and 3) will exhaustion of administrative remedies result in irreparable harm to the claimant. *See Marshall v. Burlington Northern, Inc.*, 595 F.2d 511, 513 (9th Cir. 1979) and authorities cited therein.

In deciding the "jurisdictional appearance" issue, the initial focus is on Shawnee's contention that the Secretary exceeded his authority because Shawnee's tipple is not an "activity . . . in connection with a surface coal mine . . ." 30 U.S.C. § 1291(28) and as such is immune from the Secretary's regulation. At first blush it might seem difficult to understand how a tippling operation which processes coal removed from a coal mine is not an activity connected with the mine. The gravamen of Shawnee's argument, however, is that its tippling operation is not connected to *its* coal mine, but only processes coal removed from other, non-adjacent mines. Shawnee's tipple operations have continued since its

coal mining operations ceased, and the termination of its surface mine, Shawnee submits, is sufficient to remove its tippling operation from the Secretary's jurisdiction.

The scope of surface coal mining operations covered by the Act is exceptionally broad. Section 701(28), 30 U.S.C. § 1291(28), delineates the activities specifically determined by Congress to be encompassed within and adjunct to the term "surface coal mining operation:"

> Activities conducted on the surface lands in connection with a surface coal mine * * *. Such activities include * * * the cleaning, concentrating, loading of coal for interstate commerce at or near the mine site. * * * and the areas upon which such activities occur (including) stockpiles * * * processing areas * * * and other areas upon which are sited structures, facilities, or other property or materials on the surface; resulting from or incident to such activities.

This provision leaves little doubt that Congress intended tippling operations to fall within the Act's ambit. And for the reasons outlined in *In re Permanent Surface Mining Regulation Litigation*, (D.D.C.1980) (No. 79–1144) we conclude that Congress intended the Act to encompass off-site processing operations, such as Shawnee's tippling operation. On this point then, there is every indication that the Secretary correctly asserted jurisdiction over Shawnee.[8]

In the district court Shawnee also argued that it is not an "operator" as that term is defined in § 701(13), 30 U.S.C. § 1291(13). Under that section an operator is defined as anyone who removes or intends to remove 250 tons of coal within twelve consecutive calendar months in any one location. From the Act's inception in August, 1977, until it ceased operations in

December, 1978, a period exceeding twelve months, Shawnee unquestionably qualified as an operator. At the time the cessation orders were issued, Shawnee was still reclaiming its mine site. It is beyond cavil that the Secretary retains jurisdiction over an operator who has ceased removing coal until the reclamation activities are completed. *See* §§ 507, 515, 518. Whether the Secretary retains jurisdiction over a company which has ceased mining and finished reclamation but which still conducts activity in connection with a surface mining operation, *i. e.*, a tippling operation, is a question not clearly before us today. Our observations on the issue are relevant only to whether it is clear that the Secretary is without jurisdiction. We must reject Shawnee's argument because to accept it would deny the Secretary jurisdiction over parties who have ceased mining but which are still actively engaged in reclamation, a result clearly not countenanced by the Act.

The second prong of the test examines whether the agency's expertise will be helpful in deciding the jurisdictional challenge. In this case the jurisdictional answer will be provided by applying the statute to the facts. Agency expertise is particularly helpful when a question turns on such analysis. *McKart, supra*, 395 U.S. at 198, 89 S.Ct. at 1665; *Marshall v. Northwest Orient Airlines, Inc.*, 574 F.2d 119, 122 (2d Cir. 1978). This expertise is especially appropriate in the context of an agency interpreting a new and complex statute. *Train v. NRDC*, 421 U.S. 60, 87, 95 S.Ct. 1470, 1485, 43 L.Ed.2d 731 (1975). Specifically, the Interior Board of Surface Mining Appeals has held that whether an operation is an activity connected with a surface coal mining operation "depends on the particular factual circumstances of each case." *Ross Tipple v. OSM*, 1 IBSMA 303, 304 (1979). Accord-

---

8. The district court relied on the decision of the Board of Surface Mining Appeals in *Western Engineering, Inc.*, 1 IBSMA 202 (1979). There, the IBSMA held that a wholly independent coal transportation company which never removed or owned any of the coal it processed was not covered by the Act. This decision would not, without more, protect Shawnee because Shawnee has mined coal and owns the coal it

processes. Moreover, in a subsequent decision the IBSMA limited *Western Engineering* to its facts in refusing to hold that all independent tipple operators are excluded from the Act. *Ross Tipple v. OSM*, 1 IBSMA 303 (1979). This holding was reaffirmed in *Drummond Coal Co.*, 2 IBSMA 96 (1980), and in *Bethlehem Mines Corp.*, 2 IBSMA 215 (1980).

ingly, the statutory interpretation of the jurisdictional issue is better left to the agency itself for initial consideration and application of its specialized expertise. *See Marshall v. Burlington, supra,* 595 F.2d at 513.

 Finally, we must consider whether exhaustion of administrative remedies would have resulted in irreparable harm to Shawnee. The district court found that Shawnee would suffer such harm because upon receipt of the cessation order it was faced with the choice of shutting down or incurring a $750.00 per day penalty for each violation. That analysis ignores the temporary relief provisions expressly provided in the Act; first with the Secretary and subsequently, if necessary, in district court, Shawnee could have sought suspension of the cessation orders. If either the Secretary or the court had granted temporary relief, not only could operations continue, but any penalty assessed, as here, under § 518(h), 30 U.S.C. § 1268(h), is suspended pending a final decision by the Secretary. The availability of effective relief from the Secretary thereby precludes the conclusion that Shawnee was faced with imminent, irreparable harm. Even if the prospect for obtaining relief appeared doubtful, that would not, by itself, warrant an evasion of the exhaustion requirement. Congress considered the competing interests of the operators and the environment and in prescribing the standards which apply to the Secretary and courts alike in administering temporary relief and it chose to place greater weight on environmental protection. *See Virginia Surface Mining and Reclamation Ass'n. v. Andrus,* 604 F.2d 312, 315 (4th Cir. 1979).

Shawnee has also argued that exhaustion was not required because Section 10(c) of the Administrative Procedure Act, 5 U.S.C. Section 704, authorizes judicial review of all "final" orders regardless of whether there has been an appeal to a superior agency authority. In light of our conclusion that the Surface Mining Act requires exhaustion of administrative remedies before resorting to judicial review, this contention is without merit. *See Nor-Am Agricultural Products, Inc. v. Hardin,* 435 F.2d 1151, 1158 (7th Cir.), *cert. denied,* 402 U.S. 935, 91 S.Ct. 1399, 28 L.Ed.2d 870 (1970). *See also Monterey Coal Co. v. Federal Mine Safety and Health Review Commission,* 635 F.2d 291, 293 (4th Cir. 1980).

The decision of the district court is reversed and the case is remanded to the district court for vacation of the injunction entered against the Secretary.