**Alvin NAGEL, d/b/a Fred W. Nagel & Sons, Inc., Lynn Mayer, d/b/a Lynn Mayer Gladiolus Farms, Donald Mayer, d/b/a Donald Mayer & Sons, George Mayer, d/b/a George Mayer & Sons, James Cary, d/b/a J.M. Cary & Sons, Allen Poest, d/b/a Allen Poest Gladiolus, Henry Nagel, d/b/a Nagel Bulb Farm, John Mayer, d/b/a Sunshine Gardens, John Westerhoven, d/b/a Westerhoven Flower Farms, Plaintiffs,**

v.

**Lee M. THOMAS, Administrator, Environmental Protection Agency, Defendants.**

**No. K87–198.**

United States District Court, W.D. Michigan, S.D.

July 24, 1987.

Smith, Haughey, Rice & Roegge, by Brian J. Plachta, Grand Rapids, Mich., for plaintiffs.

Office of Gen. Counsel of U.S., John A. Amodeo, Cara Joblon, Michael Shiparski, Washington, D.C., for defendants.

## OPINION

ENSLEN, District Judge.

The Court held a hearing in the above-captioned case on defendant's motion to dismiss on May 27, 1987. At the hearing, the Court rendered an oral opinion from the bench granting defendant's motion to dismiss. Because there are but a handful of published opinions that discuss the subject matter and central issues of this case, the Court has decided to issue its bench opinion in written form with a few minor modifications. The following opinion is thus intended solely to memorialize the oral opinion I rendered at the May 27th hearing and has no effect on the validity of the Order the Court issued on May 27, 1987.

Dinoseb is a herbicide used in Michigan to control ragweed. Dinoseb has been used since 1956 by Michigan gladiolus growers. Plaintiffs are such growers. While Dinoseb is not registered for home use, since 1948 the Environmental Protection Agency (EPA) has issued commercial registrations for the sale, distribution and use of pesticide products containing Dinoseb or any of its salts under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136d(b). Further, Dinoseb may only be used by applicators certified through the Department of Agriculture of the State of Michigan. A majority of the certified applicators of Dinoseb, in Michigan at least, are apparently the growers themselves.

Defendant is Lee M. Thomas, the Administrator of the EPA. Plaintiff invokes jurisdiction pursuant to 28 U.S.C. § 1331, 7 U.S.C. § 136n(c) and 7 U.S.C. § 136d(c)(4). The matter is before the Court on plaintiffs' motion for a preliminary injunction seeking to restrain defendant during the pendency of the Dinoseb cancellation proceedings from enforcing its emergency suspension order with respect to gladiolus crops grown within the State of Michigan, but is immediately before the Court on defendant's motion to dismiss.

If the Administrator determines that the use of a registered chemical causes unrea-

sonable adverse effects on the environment, he has three different regulatory responses from which to choose: 1) he may cancel a registration; 2) he may suspend a registration pending cancellation, called in the literature "ordinary suspension"; or 3) he may suspend a registration pending suspension, called in the literature "emergency suspension." *See Dow Chemical Company v. Blum*, 469 F.Supp. 892 (E.D.Mich. 1979). Here the Administrator chose the third option, the emergency suspension.

Put differently, once the Administrator determines that the use of a registered chemical generally causes unreasonable adverse effects on the environment, he may issue a notice of his intent to cancel the registration and hold a formal adjudicatory hearing to determine whether or not the registration should be cancelled.

However, the Administrator may, as he has done here, determine prior to holding a cancellation hearing that the registration for pesticides should be suspended. Still, pursuant to Section 6(b) of FIFRA, 7 U.S.C. § 136d(b), the Administrator may not suspend a registration unless he determines that: 1) suspension is necessary to prevent an imminent hazard; and 2) that he has also considered more restrictive uses as an alternative to cancellation.

Section 2(1) of FIFRA defines "imminent hazard" as a situation where unreasonable adverse effects on the environment will occur during the time required for a cancellation proceeding. Pursuant to Section 2(bb) of FIFRA, the determination of the existence of unreasonable adverse effects on the environment depends upon whether there exists an unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of use—the so-called risk/benefit analysis.

On October 14, 1986, the Administrator gave notice in the Federal Register pursuant to Section 6(b)(1) of FIFRA that the continued use of Dinoseb during the pendency of a cancellation proceeding involves unacceptable risks to persons applying the product. However, plaintiffs argue that the EPA's October 1986 Pesticide Fact Sheet concedes that there is no hazard to persons consuming food that has been treated with Dinoseb.

On October 14, 1986, the Administrator also published a notice in the Federal Register pursuant to Section 6(b)(1) of its intent to cancel the registration for Dinoseb and to deny all pending applications for registration of Dinoseb.

However, pursuant to Section 6(c) of FIFRA, only registrants, that is, companies engaged in the manufacture of chemicals for agricultural uses, may request a hearing to challenge the EPA's entry of an emergency suspension order. While registrants did originally file a number of requests for a hearing, those requests were later withdrawn and a final "emergency suspension order" was entered on October 30, 1986.

Plaintiffs argue that the suspension order violated Sections 6(b) and (c) of FIFRA in that the EPA has failed to take into account adequately the economic environmental costs and benefits of the use of Dinoseb. Plaintiffs conclude that the order to suspend all uses of Dinoseb during the pendency of the cancellation proceeding is arbitrary, capricious and an abuse of discretion.

The threshold issue before the Court is whether this Court has jurisdiction to hear plaintiffs' motion for a preliminary injunction to enjoin the enforcement of the EPA's enforcement order. Section 6(c)(4) of FIFRA, 7 U.S.C. 136d(c)(4) provides that:

> Any order of suspension entered prior to a hearing before the Administrator shall be subject to immediate review in an action by the registrant or other interested person with the concurrence of the registrant in an appropriate district court, solely to determine whether the order of suspension was arbitrary, capricious or an abuse of discretion, or whether the order was issued in accordance with the procedures established by law.

Plaintiffs argue that the emergency suspension was issued prior to a hearing pursuant to FIFRA, 6(c)(3). Although several registrants requested a hearing following

notice of the emergency suspension order, they later withdrew their requests; and in plaintiffs' view, a final order was entered on October 30, 1986. Further, plaintiffs suggest that several requests for a hearing to reconsider the order are presently pending before the Agency.

It is true that FIFRA precludes judicial review by a court in ordinary suspension actions where registrants are given notice of an opportunity to request a hearing *before* issuance of an order and fail to request the hearing. *See* 7 U.S.C. § 136d(c)(2).

In this case, however, plaintiffs argue that the Agency proceeded under its emergency powers as set forth in FIFRA and issued the emergency order prior to any registrant being given an opportunity for a hearing.

The Court notes that while the word "emergency" is not explicitly defined in FIFRA, the EPA has interpreted the term to mean a threat of harm to humans and the environment so immediate that the continuation of pesticide use is likely to result in unreasonable adverse effects during a suspension hearing. *See Dow Chemical Company v. Blum, supra,* (remarking that the case involved the first time an emergency suspension order had been before a court on judicial review, discussing the court's duty to make a substantial factual inquiry in technical cases and, at the same time, noting the narrow standard of judicial review; and finally, holding that under the facts presented, EPA had not made a clear error of judgment in issuing its emergency suspension order in that year).

■ Again, the threshold issue is whether this Court has jurisdiction. I have heard oral argument on that issue today, and I have read the submissions by the parties prior to today. At the outset I note, and I believe it is obvious to all the parties, that plaintiffs' argument rises or falls with the Court's response to *"Love"*—the case *Love* (*see James M. Love, et al. v. Lee M. Thomas,* —— F.Supp. ——, No. 87–343, slip op. (D.Or. April 15, 1987)), not the Court's emotional state. Plaintiffs rely heavily, if not exclusively, on *Love.* In fact, one might

almost say plaintiffs are infatuated with *Love.* The Court thinks perhaps too infatuated with *Love.* Perhaps the plaintiffs are asking the Court to subscribe to that Latin maxim *"amor vincit omnia"* translated, of course, "love conquers all."

The Court cautions, however, that plaintiffs' argument relies too much on *Love.* For the Latinists have also observed *"amere et sapere vix deo conceditur,"* translated, "To love and be wise at the same time, not even the gods can do that!" Put differently, the Court cannot embrace *Love.*

The Court admits that *Love* on its face, or perhaps I should say, at first sight, seemed persuasive. Alas, for plaintiffs, that relationship did not last.

Put succinctly, the dilemma with which the *Love* court was confronted was: What does a judge do when there has been an emergency suspension order and the registrant at first asks for a hearing and then withdraws his request? At first blush, that factual contingency is not expressly provided for within the statutory scheme of FIFRA.

The Court has previously noted that there are three tiers to the statutory scheme cancellation, an "ordinary suspension," and an "emergency suspension". Still, those tiers are not completely independent of one another.

In fact, the "ordinary suspension" and the "emergency suspension" order are intimately connected. The first sentence of 7 U.S.C. Section 136d(c)(3), the "emergency suspension" section, expressly states that "paragraph (2) shall apply when the Administrator issues an emergency order." Paragraph (2) refers to Section 136d(c)(2), the "expedited hearing" section.

Of course, an ordinary suspension is triggered when there is an intent to "suspend" which does not take place immediately. Registrants get five days to request an "expedited hearing." But an expedited hearing on what? An expedited hearing on the "immediate hazard" factor. However, if there is no request from the registrant, the ordinary suspension decision is final and there is no court review—on any level.

That is all there is to it. That is the intent of Congress.

On the other hand, if there is a request for an "expedited hearing," a final order is not issued until after the expedited hearing is completed. The Court notes that, because in the latter case there would be a record made after a public hearing, the statute provides for judicial review only in the court of appeals.

Now when there is an "emergency suspension"—as there was in this case—there is the possibility of immediate judicial review in the district court. Why? Put simply, because there is then a question of whether there was a good reason for the immediate suspension or whether it was simply "arbitrary."

The more fundamental question, under this statutory scheme, is why *immediate* access to the district court is necessary? It is necessary because the "expedited hearing" under the ordinary suspension order, the existence of which is contemplated by the scheme, may take too long and therefore the registrant—or the interested person with the consent of the registrant—can seek review on this basically "procedural" step which was made without the benefit of a public hearing.

What is interesting—and most significant for the purposes of this motion—about the statutory scheme is that while the registrant, or interested person with the registrant's concurrence, has the right to seek immediate judicial review of the emergency suspension order pursuant to Section 136d(c)(4), that right depends on the "status of the expedited hearing" that is taking place or scheduled to take place as set forth in the "second tier" of the suspension order. As the Court has previously pointed out, the statute itself makes that clear.

At this point we are confronted with the dilemma I posed earlier. What happens when a registrant requests a hearing, then withdraws his request for a hearing? Put simply, is the withdrawal of a request the functional equivalent of "no request" within the meaning of 7 U.S.C. Section 136d(c)(2) so that the suspension order is final and no judicial review is available?

The government argues that the suspension became effective immediately upon the issuance of the order and that the four registrants invoked their right to an expedited suspension hearing on the question of imminent hazard pursuant to Section 136d(c)(2) and (3). No person sought review in a district court of the Administrator's declaration of an emergency under 7 U.S.C. Section 136d(c)(4).

Three weeks later, on October 30, 1986, these registrants withdrew their requests for an expedited suspension hearing. The docket was closed and the suspension order became final pursuant to Section 136d(c)(2).

The Court finds that the plaintiffs never requested a cancellation hearing and did not request leave to file a brief in the suspension hearing. The government emphasizes that the registrants withdrew their request for a hearing before any significant development in the proceedings and before other parties, such as the users of pesticides, had intervened.

The government argues further that when the registrants withdrew their request for a hearing, they waived *their* right to a hearing thereby satisfying the essential precondition for an unreviewable order.

■ The *Love* court answered the dilemma posed by this Court by finding that the withdrawal of the request under these—or virtually identical—circumstances was not the equivalent of "no request" under the statutory scheme. Why did the *Love* court so rule? The answer is that the *Love* court found that such a ruling would deny the growers—who were "other interested persons" within the meaning of the statute—their day in court.

But are the growers—even with the "consent" of the registrants—entitled to a day in court when there is essentially no hearing taking place and no hearing on the horizon? The Court notes that under the statutory scheme of FIFRA these others have only a limited role to play. In an expedited hearing that does take place, these "others" are allowed to file briefs if they are adversely affected. If they do so,

they then become, or are considered, parties to the proceedings for a limited purpose, and this limited purpose is set forth in Section 136n(b). Section 136n(b), of course, allows for review only by the court of appeals in such a situation because there will have been a record following a public hearing.

The *Love* court in essence gave nonregistrants a larger role to play than Congress has provided in the context where the registrants themselves are not even seeking an expedited hearing on the "imminent hazard" factor pursuant to an "expedited hearing."

If we analogize the order of cancellation, the suspension and the "emergency suspension" to the permanent injunction, the preliminary injunction, and the temporary restraining order as did Judge Harvey in *Dow*, the logic and limits of the statutory scheme become clear.

To allow these "others" an immediate right to challenge the EPA's temporary restraining order even where the registrants have in effect consented to the EPA's "preliminary injunction" makes no sense. Nor does it make sense to say that once the registrants have taken themselves out of the game, they can then call in a "substitute," another player, to challenge a "call" which has been rendered moot. After all, under the statutory scheme it is the registrant who has the right to seek "immediate review," derivatively—in the sense that he must seek and obtain the registrant's consent.

The *Love* court created an "equitable exception" to the statutory scheme in permitting the "interested other" to make an "end run" around what Congress had intended. It makes no sense to say that these "interested others" had a right to an "immediate" hearing some six months or longer after the order was entered. The Court thinks such a reading does violence to the statutory scheme and is contrary to common sense.

The Court agrees with the government that Section 136d(c)(4) is a limited remedy designed to provide review of EPA's determination that suspension must take effect while the issue of suspension is considered in a hearing, that is to say, it is designed to provide review of the determination that an emergency exists. *See Dow Chemical Company v. Blum,* 469 F.Supp. at 898, 901, 902, 906, 907.

The Court also agrees with the government that that section "was not intended to open the door to judicial review indefinitely merely because the registrant waived its opportunity for a hearing." *See* Defendant's Brief at 10.

In sum, the Court believes that the district court in *Love* misconstrued Section 136d(c)(4) to find jurisdiction for review of a final suspension order.

The government argues that the EPA, as the agency that administers the statute and the agency which was involved in the legislative process leading to its revision in 1972, should be shown deference to its own interpretation. *See Chevron, U.S.A. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Dow Chemical Company v. Blum,* 469 F.Supp. at 901. The *Love* court simply did not do so. This Court believes the EPA is entitled to such deference in this instance.

Finally, the government argues that in creating its "equitable exception" to the statutory framework, the *Love.* court attempted to strike its own balance between the rights and interests of registrants and nonregistrants. Yet Congress has already done so. In fact, Congress has repeatedly amended this statute for the purpose of reconciling various competing interests. *See Merrill v. Thomas,* 807 F.2d 776 (9th Cir.1986).

■ Moreover, as the Fifth Circuit has recognized, the rights of nonregistrants must be limited to the express provisions of the statute. *See McGill v. EPA,* 593 F.2d 631, 636–637 (5th Cir.1979). This Court has found that the suspension order in this instance has become final and that the nonregistrant growers do not have the right to judicial review of that order under the statute.

It is clear that Congress intended a less demonstrative role for nonregistrants than

that assigned to them by plaintiffs and by the *Love* court. The statutory framework itself reveals their limited role. The Court declines to modify that scheme or enlarge the nonregistrant role. The Court therefore finds that it does not have jurisdiction pursuant to 7 U.S.C. § 136d(c)(4).

The Court emphasizes that in making its ruling it has relied upon the plain language of the statute as well as "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Institute,* 467 U.S. 340, 345, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984).

■■■ The Court believes that it has interpreted the statutory scheme under FIFRA correctly. But even assuming, *arguendo,* that it has not, the Court posits an alternative basis for finding that it does not have jurisdiction.

"It is axiomatic that one must exhaust administrative remedies before procuring judicial review." *Shawnee Coal Company v. Andrus,* 661 F.2d 1083 (6th Cir.1981). Moreover, where a plaintiff has not exhausted his administrative remedies, the Court usually is deprived of its subject matter jurisdiction. *See Bisson v. Secretary of Health and Human Services,* 787 F.2d 181 (6th Cir.1986). The Sixth Circuit in *Shawnee* noted:

> [t]he basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise and to correct its own errors so as to moot judicial controversies....[T]he doctrine also promotes a sensible division of tasks between the agency and the courts: parties are discouraged from weakening the position of the agency by flouting its process and the courts' resources are reserved for review and resolution of those matters where a dispositive solution is unavailable in the administrative process.

*Shawnee,* 661 F.2d at 1092.

The government argues that plaintiffs have failed to exhaust their administrative remedies and have proceeded directly to this Court on a claim which has never been presented to the agency.

Further, the EPA has, by regulation, established a procedure for users to obtain reconsideration of a suspension order as it applies to them. *See* 40 C.F.R. Part 164, Subpart D. Under the EPA regulations, users can present specific information with respect to how they are affected by a suspension order and the agency may reevaluate the risks and benefits in the context of their specified situation. The government asserts that neither plaintiffs nor any other growers of ornamental bulbs have ever applied for reconsideration of the Dinoseb suspension order under Subpart D.

Further, the government argues that plaintiffs have failed to take advantage of a variety of other formal or informal mechanisms which could have alleviated the harm caused them by the suspension order. Defendant argues:

1) Plaintiffs failed to intervene in the imminent hazard hearing convened pursuant to the registrants' hearing requests. Had plaintiffs moved to intervene, they could have filed briefs and could have appealed any adverse decision. (The plaintiffs do not address this issue except to indicate that they were, apparently, unaware of the hearing until November 1986).

2) Plaintiffs could have tried to persuade some registrant not to withdraw from the imminent hazard hearing. (Plaintiffs do not address this issue either, apparently because they were not aware of the hearing).

3) Plaintiffs could have spoken with the Agency either before or after entry of the final suspension order about their concerns. Plaintiffs respond that they talked to the companies involved in manufacturing the herbicide, state agricultural people, and state legislators, but went to the EPA only at the eleventh hour.

4) Plaintiffs could have requested that the Agency provide information concerning registered alternatives. The plaintiffs respond that they went to the administrative agency, EPA, only very recently.

5) Plaintiffs could have requested that the state of Michigan seek an emergency exemption for some registered alternative under Section 18, 7 U.S.C. 136p. I am unclear what plaintiffs' argument is here, except that they attempted to persuade the State of Michigan. What is clear, is that Michigan did not seek relief under 136p.

The Court finds that the principles underlying the exhaustion doctrine are readily applicable in this case. The review which plaintiffs seek essentially places the Court in a position where it is asked to perform a function which is really within the expertise of the EPA, not within that of the Court. Further, the Court would have to perform this analysis without the benefit of a fully developed factual record.

Moreover, the function of a suspension "is to make a preliminary assessment of evidence and probabilities, not an ultimate resolution of difficult issues." *See Environmental Defense Fund v. EPA,* 465 F.2d 528, 537 (D.C.Cir.1972). Further, the "expedited nature of the suspension proceeding imposes limitations on the degree of detail that can be expected from the Administrator's findings at this stage of the administrative process." *Environmental Defense Fund v. EPA,* 510 F.2d 1292, 1303 (D.C.Cir.1975).

The government argues that Subpart D is a "safety valve" which assists in regulating the statutory scheme. Where the Agency's preliminary assessment, based on major uses of a pesticide, results in a suspension order which is inappropriate with respect to a minor use, it is Subpart D which allows the Agency to reassess the order as it applies to the "minor" use and make accommodations if it finds such accommodations necessary. Thus, it is the function of the exhaustion doctrine to allow the Agency to correct its own errors.

The government argues that the gladiolus growers never gave the scheme a chance to work. Further, the government argues that to grant judicial review under these facts threatens to undermine the statutory scheme.

The Court finds the government's argument persuasive. Of course, plaintiffs are not required to exhaust their administrative remedies under certain circumstances. The Sixth Circuit has enumerated those situations in which plaintiffs' failure to exhaust his remedies would be excused:

1. Where the administrative remedies are inadequate or not efficacious;

2. Where pursuit of the remedies would be futile;

3. Where irreparable injury would result unless immediate judicial review is permitted;

4. Where administrative proceedings would be void;

5. Where there has been a readily observable usurpation of power not granted to the agency by Congress; or

6. Where there is a constitutional challenge to the agency's proceedings.

*See Shawnee Coal Company v. Andrus,* 661 F.2d at 1053 (6th Cir.1985); *Southern Ohio Coal Company v. Donovan,* 774 F.2d 693 (6th Cir.1985).

The Court will address these exceptions seriatim.

1. The government argues that subpart D is a remedy which is clearly adequate and efficacious in that proceedings under that provision could have provided plaintiffs with the relief they seek. Plaintiffs simply argue this remedy is somehow outside the scheme of FIFRA. The Court finds Subpart D to be adequate and efficacious and notes that vegetable growers in Idaho and Washington successfully invoked Subpart D relief—as these plaintiffs could and should have done.

2. Defendant argues further that there is no reason to believe that resort to these proceedings would have been futile. In fact, some growers have been granted a modification of the Dinoseb suspension when asked for—in fact, the only growers who have, to the Court's knowledge, asked for it. That point was brought home even in the *Love* opinion upon which plaintiffs rely.

3. It is hard for the Court to see plaintiffs' irreparable harm argument. It is clear that in the preliminary injunction con-

text the immediate financial loss by itself does not constitute irreparable harm. The Court also finds the last three grounds set forth in plaintiffs' brief inapplicable.

Subpart D proceedings would not have been void; EPA has the statutory authority to issue a suspension order, and plaintiffs have alleged no constitutional defect in the EPA's proceedings.

In summary, the Court finds that under the facts presented here there are no exceptions to the exhaustion doctrine which are applicable. Consequently, the Court finds that it does not have subject matter jurisdiction for a second reason, namely, that plaintiffs have failed to exhaust their administrative remedies.

Plaintiffs also argue that the Court has jurisdiction under 7 U.S.C. 136n(c). While that section does give the district courts jurisdiction specifically to enforce and to prevent and restrain violations of FIFRA, that language is inapplicable here where other specific provisions of FIFRA clearly indicate that judicial review of suspension orders is either exclusively in the court of appeals or unavailable.

Moreover, in any event, private citizens cannot invoke this section to bring direct enforcement actions under FIFRA. *See Fiedler v. Clark*, 714 F.2d 77, 79–80 (9th Cir.1983). Accordingly, I find that the Court does not have subject matter jurisdiction under 7 U.S.C. 136n(c).

Plaintiffs also argue that there is jurisdiction under 28 U.S.C. § 1331. When the sovereign consents to be sued, it is well established that it can attach conditions to its consent and that such jurisdictional statutes are to be construed narrowly. Further, where a regulatory statute provides a comprehensive scheme for judicial review, those provisions are exclusive and preclude actions under general jurisdictional provisions. *See Middlesex County Sewerage Authority v. National See Clammers*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Day v. Wayne County Board of Auditors*, 749 F.2d 1199, at 1204 (6th Cir. 1984).

FIFRA, as we have seen, is just such a statute. Its provisions are exclusive and preclude district court jurisdiction to review suspension orders under the general federal question grant of authority in 28 U.S.C. § 1331.

The Court holds that it does not have subject matter jurisdiction and will enter an order granting defendant's motion to dismiss and dismissing plaintiffs' complaint and motion for preliminary injunction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.