DETROIT NEWSPAPER AGENCY;
and The Detroit News, Inc.,
Plaintiffs,

v.

William SCHAUB, Regional Director of
Region 7 of the National Labor Rela-
tions Board; and Fred Fienstien, Act-
ing General Counsel of the National
Labor Relations Board, Defendants.

No. 99–CV–73963–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 2, 2000.

Robert M. Vercruysse, Gary Fealk, William Altman, Vercruysse, Metz & Murray, Bingham Farms, MI, for plaintiffs.

Theodore C. Niforos, National Labor Relations Board, Detroit, MI, Margery E. Lieber, Meredith Burns, Contempt Litigation Branch, National Labor Relations Board, Washington, D.C., Eric G. Moskowitz, National Labor Relations Board, Washington, D.C., for defendants.

### ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR INJUNCTION & DECLARATORY JUDGMENT AND DENYING DEFENDANTS' MOTION TO DISMISS COMPLAINT

CLELAND, District Judge.

### I. Introduction

Before the court is the motion of Plaintiffs Detroit Newspaper Agency and The Detroit News (collectively "DNA") requesting that the court enjoin the defendant National Labor Relations Board ("NLRB" or "Board") from prosecuting 59 unfair labor practice charges against DNA; DNA asserts that the charges were filed outside the statute of limitations found in 29 U.S.C. § 160(b), and that the Board is therefore acting beyond its jurisdiction. The Board, on the other hand, contends that the charges were timely filed under its interpretation of the statute of limitations; however, it also contends that this court is without jurisdiction to decide the matter, and that the Board's actions are beyond judicial review until DNA exhausts its administrative remedies and appeals any adverse decision to the court of appeals.

DNA filed its "Motion for Injunction and Declaratory Judgment" on August 10, 1999. The NLRB filed a response in the form of a "Motion to Dismiss Complaint" on August 31, 1999, and a hearing brief on September 3, 1999. DNA filed its hearing brief on September 7, 1999. Upon learning that the parties were also litigating the identical issues before the Board, the court issued an order on September 9, 1999, holding all district court proceedings in this matter in abeyance until the NLRB had availed itself of the opportunity to make its own determination as to whether the charges were timely filed. The Board issued a decision on January 21, 2000, in which it determined, among other things, that the charges at issue were timely filed because they were "closely related" to other timely filed charges, and that the Board had jurisdiction to litigate the 59 contested charges. The Board having held that the administrative litigation of the unfair labor practice charges could proceed, the court was still required to rule on the pending motions. In light of the Board's decision, the parties filed supplemental briefs on March 3, 2000. A trial of the 59 charges in a consolidated complaint before an NLRB

administrative law judge is currently set for September 13, 2000.

## II. Background

The material facts are undisputed. On July 13, 1995, several unions initiated a strike against DNA, a strike that lasted approximately one-and-a-half years. During the course of the strike, DNA disciplined and discharged numerous employees for various forms of alleged misconduct, which misconduct may or may not have been related to the strike. On behalf of their members, the unions filed unfair labor practice charges ("ULP") with the NLRB, some of which the Board eventually found to be meritorious and subsequently filed administrative complaints against DNA. The first charge forming the basis of a complaint was charge 7–CA–38079 and was filed with the NLRB on January 24, 1996. Numerous other complaints were consolidated with 7–CA–38079, and eventually complaints by 96 individuals were tried together before an NLRB administrative law judge ("ALJ") in an intermittent trial lasting from April 7, 1997 to September 23, 1998.

While the trial progressed, the unions filed additional ULP charges with the Board, asserting that DNA had unlawfully meted out disparately harsh treatment to striking employees compared to nonstriking employees who had committed similar offenses. Charge number 7–CA–40759 was filed on March 13, 1998, and charge numbers 7–CA–40943 and 7–CA–40944 were filed on May 6, 1998. All three charges concerned ULP incidents that occurred more than six months before the charges were filed. In relevant part, each of the charges alleged as follows:

> As disclosed through newly discovered evidence, the Employer has issued to nonstrikers lesser forms of discipline than to strikers for comparable or more severe acts of alleged misconduct. This

disparate treatment of strikers violates §§ 8(a)(1) and (3) of the Act.

Ex. 102–05 (italics emphasis added). The charges do not indicate when the charging parties learned of the alleged disparate treatment, or specify how they came to know of it.

On September 23, 1998, the final day of the aforementioned trial before the ALJ in case number 7–CA–30879 et al., the NLRB's General Counsel moved to amend that consolidated complaint to add the ULPs of some 77 additional individuals from charge numbers 7–CA–40759, 7–CA–40943, and 7–CA–40944. DNA objected to the amendment, and the ALJ denied the motion to amend on September 23, 1998, stating that the motion was untimely and that the General Counsel had failed to show good cause.

On October 16, 1998, the General Counsel appealed the ALJ's denial to the full Board, which upheld the ALJ's decision on February 25, 1999. On June 8, 1999, the General Counsel filed a motion with the ALJ to "Find Discharges [in charge numbers 7–CA–40759, 7–CA–40943, and 7–CA–40944] Closely Related to Consolidated Complaint [charge number 7–CA–30879 et al.] and to Remand Additional Allegations to Regional Director." This new motion applied to 59 of the 77 individuals from the previous motion to amend. Noting that the new motion was virtually identical to the previous motion to amend (except for the reduced number of individuals),[1] the ALJ denied the motion on June 30, 1999 for identical reasons.

On July 19, 1999, the NLRB's Regional Director issued a new Consolidated Complaint based upon charge numbers 7–CA–40759, 7–CA–40943, and 7–CA–40944, which alleged that the aforementioned charges were "closely related" under Redd–I, Inc., 290 NLRB 1115 (1988), to the previously tried Consolidated Com-

---

1. Indeed, the NLRB General Counsel's brief here refers to the second motion as one for reconsideration.

plaint based on charge number 7–CA–30879 *et al.* In relevant part, the new Consolidated Complaint alleges that DNA had discharged the listed employees "to discourage employees from engaging in [protected concerted] activities" and had discriminated "in regard to the hire or tenure or terms or conditions of employment of their employees, thereby discouraging membership in a labor organization in violation of Section 8(a)(1) and (3) of the Act." Ex. 111 at 6. The complaint does not indicate when the charging parties learned of the alleged disparate treatment, or specify how they came to know of it.

DNA responded by filing both a motion to dismiss with the Board, as well as the instant injunctive motion with this court, both arguing that the Board lacked jurisdiction to prosecute the charges in the new Consolidated Complaint because they were barred by the section 10(b) statute of limitations.

### III. The District Court's Jurisdiction

Pursuant to 29 U.S.C. § 160(f), "[o]nly the courts of appeal have jurisdiction to *review* final orders of the Board." *Collins v. NLRB,* 94 F.3d 644 (Table), 1996 WL 456036 at *2 (6th Cir. Aug. 12, 1996) (unpublished opinion) (emphasis added). Ordinarily, litigants before the Board must exhaust their administrative remedies before obtaining judicial review of the Board's actions. *See, e.g. Shawnee Coal Co. v. Andrus,* 661 F.2d 1083, 1092–93 (6th Cir.1981). The parties to the instant dispute agree in principle, however, that an exception to these general rules exists that permits federal district courts to examine the Board's actions.

The exception is a "narrow anomaly reserved for extreme situations," *id.* at 1093, and exists only when the Board's action is "manifestly beyond the realm of its delegated authority." *Southern Ohio Coal Co. v. Office of Surface Mining, Reclamation, & Enforcement,* 20 F.3d 1418, 1424 (6th Cir.1994). The parties do dispute whether such circumstances are presented by the instant case.

In *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), the Supreme Court was presented with a situation in which the NLRB had concededly violated a mandatory provision of the National Labor Relations Act, and the Court was faced with the question of "whether a Federal District Court has jurisdiction of an original suit to vacate that determination of the Board because made in excess of its powers." *Id.* at 185, 79 S.Ct. 180. The Court held that:

> [t]he answer surely must be yes. This suit is not one to 'review,' in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act. [The section at issue] is clear and mandatory. It says that, in determining the unit appropriate for the purposes of collective bargaining, "the Board shall not ..." Yet the Board [did precisely what the statute forbade]. Plainly, this was an attempted exercise of power that had been specifically withheld. It deprived the professional employees of a 'right' assured to them by Congress. Surely, in these circumstances, a Federal District Court has jurisdiction of an original suit to prevent deprivation of a right so given.

*Id.* at 188–89, 79 S.Ct. 180. Put simply, "a definite statutory prohibition of conduct which would thwart the declared purpose of the legislation cannot be disregarded." *Id.* at 189, 79 S.Ct. 180 (internal citation and quotations omitted).

*Leedom* does not, however, confer jurisdiction on the district court where the NLRB has made a mere error of law; "the Board must have acted without statutory authority." *U.S. Department of the Interior v. Federal Labor Relations Authority,* 1 F.3d 1059, 1062 (10th Cir.1993) (internal citations and quotations omitted) ("*Interior*

*v. FLRA* "). Arguments that the Board erroneously assessed the facts before it do not fall within the *Leedom* exception, and may not be considered by the district court. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964). Nor may the district court consider arguments concerning unclear legal issues, or issues that appear to be committed to the Board's expertise. *See, e.g., Modern Plastics Corp. v. McCulloch*, 400 F.2d 14, 17–19 (6th Cir.1968); *see also, generally, Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). To reiterate, *Leedom* permits the district court to address and resolve only potential breeches of statutory authority that are "facially clear" and in contravention of a "mandatory directive." [2] *Interior v. FLRA*, 1 F.3d at 1062.

### IV. The *Shawnee Coal* Criteria

Both parties rely upon, and to some extent, structure their arguments around the following passage from the Sixth Circuit's opinion in *Shawnee Coal*:

> In many circumstances it is easier to theorize than to discern when an agency's action is so far out of bounds, so beyond the realm of its delegated authority, that the *Leedom* exception should be invoked. In grappling with this problem the courts have employed three criteria for determining whether the exhaustion requirement should be waived: 1) is the agency's jurisdiction conspicuously lacking; 2) will the agency's expertise assist in resolving the jurisdictional issue; and 3) will exhaustion of administrative remedies result in irreparable harm to the claimant. *See Marshall v. Burlington Northern, Inc.*,

595 F.2d 511, 513 (9th Cir.1979) and authorities cited therein.

661 F.2d at 1093. It bears noting that the *Shawnee Coal* court did not hold that this tripartite evaluation was required by *Leedom*; it merely noted that "the courts have employed" these criteria. A review of *Marshall*, the 1979 Ninth Circuit case from which the *Shawnee Coal* formula is derived, reveals that *Marshall* provides only a general discussion of when judicial intervention prior to administrative exhaustion may be appropriate, *see Marshall*, 595 F.2d at 513, but contains no reference whatsoever to the Supreme Court's *Leedom* decision.

Indeed, defined in their ordinary sense, the *Shawnee Coal* criteria seem misplaced as a means of defining when *Leedom* intervention is justified. The first *Shawnee Coal* criterion—that agency jurisdiction must be "conspicuously lacking"—narrows *Leedom*'s applicability beyond its express terms. Nowhere in *Leedom* did the Supreme Court describe the statutory section at issue— § 9(b)(1) of the NLRA—as "jurisdictional." That section simply required the Board to obtain the consent of professional employees before including them in a bargaining unit with non-professional employees, consent that the Board failed to obtain in that case before doing so. *See Leedom*, 358 U.S. at 186–88, 79 S.Ct. 180. The section appears not to be "jurisdictional," inasmuch as the Board was expressly authorized to exercise power over a mixed bargaining unit, provided that the Board met the required procedural hurdle of a § 9(b) election. *See Miami Newspaper Printing Pressmen's Union Local 46 v. McCulloch*, 322 F.2d 993, 997 n. 8

---

**2.** The admonition that *Leedom* intervention is an "anomaly reserved for extreme situations" would seem to be more descriptive than prescriptive. Few federal agencies, one would hope, are foolish or willful enough to contravene an explicit statutory command. The need for Article III court intervention, however, is necessarily a function of the frequency of agency lawlessness. *See, e.g. Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328

(D.C.Cir.1996) ("the message of the [*Leedom*] line of cases is clear enough: courts will 'ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.'") (quoting *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 681, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986)).

(D.C.Cir.1963) ("Most of the verbs in other parts of Section 9 are prefaced by 'shall.' There is nothing to suggest that Section 9(b)(1) differs from any other statutory rule concerning the conduct of representation proceedings. Every plain violation of a statute rule must therefore be 'jurisdictional' in the same sense that the plain violation of Section 9(b)(1) was 'jurisdictional' in *Leedom v. Kyne.*") (internal citations omitted). *But see Couchigian v. Rick,* 489 F.Supp. 54, 56 (D.Minn.1980) (referring, without analysis, to § 9(b) as a "jurisdictional provision"). But, in the final analysis, it does not matter whether § 9(b) is jurisdictional. Under *Leedom*'s explicit holding, intervention requires not a "jurisdictional" violation, but a violation of an express statutory mandate.

The second *Shawnee Coal* criterion—whether the agency's expertise would assist in resolving the jurisdictional issue—has been superceded by the Supreme Court's decision in *Chevron,* which gives reviewing courts two simple "if-then" propositions: If Congress has directly spoken to the precise question at issue, then that is the end of the analysis, as the court must give effect to the unambiguous statutory language. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843 n. 9, 104 S.Ct. 2778 (internal citations omitted). If, however, Congress has not directly addressed the precise question at issue, then the court is obligated to uphold any reasonably permissible agency interpretation of the statute. *Id.* at 843–44, 104 S.Ct. 2778.[3] Hence, courts do not look to agencies for their "assistance" in these matters: if the statute is clear on its face, the

agency is ignored; if the statute is not clear, the court must defer to the agency so long as the agency's interpretation is within reason. Under *Leedom,* only the former circumstance warrants intervention by the district court.[4]

The third criterion—whether exhaustion of administrative remedies will result in irreparable harm to the claimant—is flatly contradicted by *Leedom* and its progeny. As the Supreme Court explained in 1991:

[C]entral to our decision in [*Leedom*] was the fact that the Board's interpretation of the [NLRA] would wholly deprive the union of a *meaningful and adequate means of vindicating its statutory rights.* "Here, differently from the Switchman's case, 'absence of jurisdiction of the federal courts' would mean 'a sacrifice or obliteration of a right which Congress' has given professional employees, for there is no other means, within their control ... to protect and enforce that right."

*Board of Governors of the Federal Reserve Sys. v. MCorp Fin., Inc.,* 502 U.S. 32, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991) (emphasis added) (quoting *Leedom,* 358 U.S. at 190, 79 S.Ct. 180). The injury prevented in *Leedom* was not "irreparable" as that term is traditionally understood; the professional employees who had been unlawfully forced into the bargaining unit by Board fiat could have exhausted their administrative remedies, and then had any and all subsequent decisions made on the basis of that illegal forced participation vacated upon appellate review. In *Leedom,* the Supreme Court noted that through the NLRA, Congress enacted a specific statutory scheme that delineated under what circumstances the Board could include certain employees in a bargaining unit. In that instance, the professional

---

**3.** As an aside, though irrelevant for purposes of the instant *Leedom* analysis, *Chevron* deference applies even to questions concerning an agency's jurisdiction. *See Oklahoma Natural Gas Co. v. Federal Energy Regulatory Comm'n,* 28 F.3d 1281, 1283–84 (D.C.Cir. 1994) (collecting cases).

**4.** Not before the court is the question of what avenues of immediate judicial relief, if any, a party might have when faced with an agency's unreasonable interpretation of an ambiguous statute.

employees possessed a "statutory right" not to be unconsensually included in the same bargaining unit with non-professional employees, a right that the Court held could not be "meaningfully and adequately vindicated" if the NLRB were permitted to violate it in any way, even though the wronged employees might obtain eventual judicial redress. The "right" protected there was the right to not be in the bargaining unit *at any time* except as defined in the Act, and to be subject to agency action only under the circumstances permitted by law. The Supreme Court made clear in *Leedom* that where an agency violates an explicit statutory stricture, the injured parties may immediately obtain judicial relief, irrespective of whether the injury incurred is "irreparable." In other words, *Leedom* defines the right to be protected not by the nature of a plaintiff's injury, but simply as the right to be free from explicitly unlawful agency action.

Of course, one can "interpret" the *Shawnee Coal* criteria to be consistent with *Leedom* and the current state of administrative law. Any mandatory statutory language could be described as "jurisdictional;" the need for agency "assistance" could be read as consistent with the second prong of *Chevron;* and "irreparable harm" might be construed to include agency action in contravention of an express statutory command. But linguistic contortions seem inappropriate for a legal system that is supposed to provide clarity, particularly when such clarity is readily available, and the lexicon of the law already has established meanings for the words and phrases. Hence, notwithstanding the instant parties' reliance on *Shawnee Coal, Leedom* requires the court to resolve only a very simple question: Has the NLRB violated an unambiguous statutory mandate?

### V. Section 10(b)

■ Title 29 U.S.C. § 160(b), commonly known as § 10(b) of the NLRA, provides in relevant part that:

[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of a charge with the Board and the service of a copy thereof upon the person against whom such charge is made ... Any such complaint may be amended by the member, agent, or agency, conducting the hearing or the Board in its discretion at any time prior to the issuance of the order based thereon[.] ... Any such proceeding shall, so far as practicable, be conducted ... under the rules of civil procedure for the district courts of the United States .. [.]

29 U.S.C. § 160(b). This six-month period for filing an unfair labor practice complaint is a statute of limitations, and is procedural, not jurisdictional. *See NLRB v. St. Francis Healthcare Centre*, 212 F.3d 945, 2000 WL 640545 at *18 (6th Cir. May 19, 2000) (publication pending).

■ The six-month limitations period accrues from the date that the plaintiff discovered or reasonably should have discovered the act constituting the alleged unfair labor practice. *See, e.g., Nida v. Plant Protection Ass'n Nat.*, 7 F.3d 522, 525 (6th Cir.1993). Section 10(b) is intended to:

[b]ar litigation over past events after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused, and of course to stabilize existing bargaining relationships.

*Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 419, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) (internal citation and quotations omitted). Elaborating on what it is that § 10(b) bars, the Supreme Court held that:

It is doubtless true that § 10(b) does not prevent all use of evidence relating to events transpiring more than six months before the filing and service of an unfair labor practice charge. However, in applying rules of evidence as to the admissibility of past events, due regard for the purposes of § 10(b) requires that two different kinds of situations be distinguished. The first is one where occur-

rences within the six-month limitations period in and of themselves may constitute, as a substantive manner, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events. The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice. There the use of the earlier unfair labor practice is not merely 'evidentiary,' since it does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful. And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice.

*Id.* at 416–17, 80 S.Ct. 822.

The Supreme Court has also held that: [T]he Board is not precluded from 'dealing adequately with unfair labor practices which are related to those alleged in the charge and which grow out of them while the proceeding is pending before the Board.'

*NLRB v. Fant Milling Co.,* 360 U.S. 301, 309, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959) (quoting *National Licorice Co. v. NLRB,* 309 U.S. 350, 369, 60 S.Ct. 569, 84 L.Ed. 799 (1940)). Hence, the Court held that while § 10(b) "does not relate to conduct subsequent to the filing of the [unfair labor practice] charge," the statutory provision "extinguishes liability for unfair labor practices committed more than six months prior to the filing of the charge." *Fant Milling,* 360 U.S. at 309 n. 9, 79 S.Ct. 1179; *see also NLRB v. Industrial Union of Marine and Shipbuilding Workers of America,* 391 U.S. 418, 424, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968) (§ 10(b) "forbids issuance of a complaint based on conduct occurring more than six months prior to

the filing of the charge—a provision promoting promptness."); *see, e.g., Summers v. Local 779, United Rubber, Cork, Linoleum and Plastic Workers of America,* 41 F.3d 1508 (Table), 1994 WL 659145 at *1 (6th Cir. Nov. 22, 1994) (unpublished opinion) (complaint filed outside § 10(b) six-month statute of limitations barred).

■ In sum, while the Board may file additional complaints for ULPs arising out of timely filed pending charges, and may also use time-barred unfair labor practices as evidence to demonstrate the existence of ULPs that are not time-barred, it may not file complaints for unfair labor practices about which the plaintiffs knew or should have known of more than six months prior to the filing of the charge.

## VI. Analysis

### A. Introduction

DNA argues that because § 10(b) bars the filing of complaints regarding ULPs that occurred more than six months before a charge was filed with the Board, the instant complaint is barred by the statute of limitations, as all of the underlying charges were filed more than six months after the alleged ULPs occurred. Accordingly, DNA contends, the NLRB lacks jurisdiction to prosecute this complaint, and the court should exercise its power under *Leedom* and enjoin the NLRB from taking any further action on the matter.

In response, the NLRB contends that the court has no jurisdiction to consider DNA's complaint because the district courts lack subject matter jurisdiction to review or enjoin NLRB proceedings, and judicial review is committed solely to the courts of appeal upon exhaustion of administrative remedies. According to the NLRB, *Leedom* intervention by the district court is unwarranted because there has been no violation of an express statutory mandate, and because the Board has the discretion and expertise to interpret § 10(b) under the *Redd–I* "closely related" doctrine, which has been upheld by several

courts of appeals, including the Sixth Circuit. Finally, the Board notes that DNA will suffer no irreparable harm because it will have ample opportunity to argue its position to the court of appeals once the administrative process is complete.

## B. Arguments Not Properly Considered Under *Leedom*

As explained before, the purpose of the *Leedom* exception to the general administrative exhaustion requirement "is to ensure that an agency's violation of a clear statutory mandate is corrected. The existence of administrative review within an agency, while laudatory, cannot substitute for judicial review." *Hanauer v. Reich,* 82 F.3d 1304, 1308 n. 2 (4th Cir.1996) (internal citation omitted). The *Leedom* exception permits the district court:

> to conduct a cursory review of the merits of the case to determine whether the [agency] violated a clear statutory mandate. When the statute in question is capable of two plausible interpretations, the [agency's] decision to adopt one interpretation over the other does not constitute a violation of a clear statutory mandate. If a cursory review of the merits reveals that the [agency] did not violate a clear statutory mandate, the case must be dismissed for lack of subject matter jurisdiction.

*Id.* at 1309 (internal citations and quotations omitted). Given *Leedom*'s limited scope, the court first notes the parties' arguments that it may not consider.

■ DNA argues that the NLRB's delay in bringing the instant charges violates the due process clause of the Constitution. Whatever the merits of DNA's position, such a argument cannot be considered by the district court under *Leedom,* as the due process clause has no explicit mandates requiring the NLRB to prosecute a case within a certain period of time. DNA's due process argument is properly put to the court of appeals after administrative review has been exhausted.

Similarly, for at least three reasons, the court will not consider DNA's contention that the Board's *Redd–I* doctrine exceeds its statutory authority. First, by its terms, § 10(b) contemplates amending complaints, and the Supreme Court's decision in *Fant Milling* leaves open the possibility—though it does not specifically discuss the issue—that in some circumstances amendments past the six month statute of limitations might be permitted if they arose out of the underlying complaint. *See Fant Milling,* 360 U.S. at 309, 79 S.Ct. 1179. Second, § 10(b) states that to the extent practicable, the NLRB should utilize the Federal Rules of Civil Procedure. Rule 15(c) specifically provides that amendments to complaints will relate back to the date of the filing provided that certain criteria are met—criteria that appear to at least approximate the Board's "closely related" criteria under *Redd–I*. *See Nickles Bakery,* 296 NLRB 927, 928 (1989) (discussing *Redd–I* "closely related" test). Third, and most decisive, is the fact that the Sixth Circuit has adopted the Board's *Redd–I* analysis, *see Don Lee Distributor, Inc. v. NLRB,* 145 F.3d 834, 844 (6th Cir.1998), and this court may not overrule the court of appeals. Each of these reasons makes clear that whatever the merits of DNA's challenge to the *Redd–I* doctrine may be, the issue is not without ambiguity, and therefore not subject to *Leedom* review. This issue would be properly presented to the court of appeals upon its review of the administrative proceedings.

Also, the court will not consider the Board's arguments that the availability of alternative judicial review and the administrative exhaustion requirement preclude *Leedom* review here. As explained in Part IV of this opinion, the Board has misconstrued what the "availability of alternative judicial review" means. Under *Leedom,* it is not enough that a court of appeals can eventually tell the Board that it acted outside its statutory authority; by then, the damage would be done. The entire point of *Leedom* is that litigants are to be pro-

tected from explicitly unlawful agency action. Just as it would have done the professional employees in *Leedom* no good to be forced for years to be part of a non-professional bargaining unit, only to later be informed on appeal that they were correct after having had their statutory rights violated during the intervening years, it would do DNA no good to be forced to litigate the instant ULPs to administrative finality only to be given a *post hoc* vindication from the court of appeals that it never should have been forced to litigate those cases because they were explicitly barred by § 10(b).

The Board's exhaustion arguments are untenable under *Leedom* and the express statutory language. Section 10(b) makes clear that a certain class of cases is "extinguished" after a certain period of time, and that an employer has a legal right to be free from having to litigate those extinguished claims; the issue before the court is whether the instant claims clearly fall within that class. Adopting the Board's interpretation regarding alternative judicial review would render *Leedom* a nullity, as virtually any argument is capable of being litigated to administrative exhaustion and appealed. The Sixth Circuit case of *Blue Cross and Blue Shield of Michigan v. NLRB*, 609 F.2d 240 (1979), upon which the Board relies for this proposition, is not to the contrary. In that case, the Sixth Circuit vacated the district court's *Leedom* injunction because *no express statutory command had been violated*, and the employer was still free to argue its legal *interpretation* on administrative review and appeal without suffering an injury expressly forbidden by statute.

Relatedly, while the Board is correct as a matter of law in refuting DNA's argument that the time, expense, and evidentiary burdens of administrative litigation constitute "irreparable harm" for injunctive purposes (as amply demonstrated by the cases cited in the Board's briefs), the issue is irrelevant. *Leedom* intervention does not require "irreparable harm" under

a traditional injunction standard; it only requires that an agency be acting in an expressly unlawful manner to someone's detriment. However, to the extent an injunction sought under *Leedom* may require an irreparable injury, such an injury is created by an agency acting in explicit contravention of its delegated powers. Simply put, *Leedom* stands for the proposition that "if an agency openly violates a clear mandate of a statute, even an implied preclusion of judicial review will not bar judicial intervention." *Chamber of Commerce v. Reich*, 74 F.3d at 1329 (quoting *United States Dep't of Treasury v. FLRA*, 43 F.3d 682, 688 (D.C.Cir.1994) (internal punctuation omitted)); *see also Gracey v. International Bhd. of Elec. Workers*, 868 F.2d 671, 674 n. 1 (4th Cir.1989) ("If an agency acts in clear derogation of its statutory authority, a court need not wait for the underlying proceedings to conclude to intervene.").

The court turns now to the issues that it may consider under *Leedom*.

## C. Whether the Board Can File an Otherwise Untimely Complaint Under the "Closely Related" Doctrine

■ The Board's position in this litigation is that:

> [B]oth the Board *and* the courts repeatedly have interpreted Section 10(b) to permit the amendment of a complaint to allow the litigation of misconduct alleged in charges filed more than six months later, where the misconduct is "closely related" to a timely-filed charge of similar misconduct. *See Redd–I, Inc.*, 290 NLRB 1115 (1988).

Bd.Mot. at 11 (emphasis in original). The Board further notes that the "closely related" doctrine has been approved by numerous courts of appeals, including (and most importantly for purposes of this litigation) the Sixth Circuit in *Don Lee*, 145 F.3d at 844–45. The Board further argues that the courts have held that the Board's interpretation of the "closely related" doctrine is entitled to deference, and that the

facts of charge numbers 7–CA–40759, 7–CA–40943, and 7–CA–40944 are "closely related" to charge number 7–CA–30879 *et al.* As previously discussed earlier in this opinion, all of these determinations are beyond this court's *Leedom*-authorized examination.

None of these arguments, however, bear on the circumstance presented in this litigation, which is not the amending of a complaint, but the filing of an *entirely new* complaint. DNA is not seeking relief from the Board's attempt to *amend* an existing case with otherwise untimely charges; that issue was resolved at the administrative level to DNA's satisfaction, and is not before the court. It is the filing of a new complaint that is the crux of the issue here, and the NLRB's address of that issue consists of the following:

> It is of no avail for Plaintiffs to argue that the General Counsel's issuance of a separate complaint, when he could not amend the Consolidated Complaint, may not have been done before. It does not follow that the General Counsel violated a clear statutory mandate where, as here, the new allegations are arguably "closely related" to timely filed charges. Indeed, as set forth above, Section 10(b) has been interpreted by the Board and the Courts to permit the amendment of a complaint to include "closely related" allegations. Given the fact that Section 10(b) has been so broadly interpreted, the General Counsel, by filing a new complaint containing allegations arguably "closely related" under *Redd–I* to timely filed charges, did not violate a clear and specific statutory requirement.

Bd.Mot. at 13–14. In its Supplemental Memorandum filed with the court subsequent to the Board's January 21, 2000 interlocutory order, the NLRB further elaborated that:

> Plaintiffs complain that the General Counsel has issued a *separate* complaint and is litigating the discharges in two proceedings. However, this is a procedural predicament of Plaintiffs own

making, and does not bring this case within the limited *Leedom* exception to nonreviewability. As noted by the Board, there is no requirement that all unfair labor practice allegations arising during an unfair labor practice proceeding concerning the same party be consolidated into one proceeding. Rather, Section 3(d) of the Act, 29 U.S.C. § 153(d), affords the General Counsel broad discretion concerning the prosecution of complaints before the Board. Further, it bears repeating that the General Counsel here had sought to litigate in the prior proceeding the allegations contained in the new Consolidated Complaint. The General Counsel was prevented from doing so *due to* the opposition of the Plaintiffs. Where as here, Plaintiffs opposed the General Counsel's earlier motion to include the new allegations in the underlaying consolidated proceeding, Plaintiffs should not be heard to complain that it violates the statute to prosecute the allegations in a separate proceeding.

Bd.Supp.Mem. at 10–11 (emphasis in original) (internal citations omitted).

None of these arguments address the issue at hand. As the Board itself points out, the "closely related" doctrine deals with the *amendment* of an existing complaint. All of the decisions cited to the court concerning the doctrine deal only with the amending of an existing complaint, and say nothing about the filing of a new complaint. The "broad interpretation" of § 10(b) given the General Counsel under the "closely related" doctrine consists of his prosecutorial discretion to make a decision, in the first instance, as to whether new ULPs are sufficiently similar in factual and legal terms to an already-existing complaint, and whether he should attempt to amend the complaint under such circumstances. However, though the General Counsel has statutorily-provided discretion in this area, he is without authority to reinterpret the unambiguous statutory meaning of § 10(b).

The NLRB's contention that the new Consolidated Complaint is "procedural predicament of Plaintiffs['] own making" is also unavailing. DNA did not "make" this "procedural predicament"—the General Counsel did. Upon the General Counsel's September 23, 1998 and June 8, 1999 motions to amend the complaint, DNA was under no obligation to sit still and acquiesce in the General Counsel's advocacy of a position inimical to DNA's interests. As any litigant is entitled to do, DNA opposed the motions. The ALJ then found that the motions to amend could not, or should not, be granted, and denied them. The ALJ's denial of the first motion was affirmed on appeal by the Board, and the General Counsel chose not to appeal the second denial. Hence, it was the General Counsel who created the current "procedural predicament" by filing an entirely new consolidated complaint on July 19, 1999. In any event, for the Board to lay responsibility for the current procedural posture at DNA's feet begs the question of whether the General Counsel was acting *ulta vires* by filing the consolidated complaint. Either he has the statutory authority to do so, or he does not.

Similarly misleading is the Board's assertion that "there is no requirement that all unfair labor practice allegations arising during an unfair labor practice proceeding concerning the same party be consolidated into one proceeding." DNA is not asserting that all ULPs concerning the same party must be prosecuted in the same proceeding; again, such determinations are, in the first instance, rightly within the General Counsel's discretion (though the presiding ALJ or Board may later weigh in on the issue). There is, however, a requirement that "[n]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of a charge with the Board ...," and it is under that requirement that DNA complains. The General Counsel has am-

ple discretion as to whether and how to prosecute timely complaints, but has no discretion to file an untimely complaint.

As DNA summarizes the argument:

> Here, the General Counsel did not issue a complaint based on Charge No. 38079 that included allegations in addition to those in the charge. Likewise, the General Counsel did not amend the complaint based on Charge No. 38079 to include additional allegations. The General Counsel simply did not "add complaint allegations." Rather, the General Counsel issued a second complaint based on a charge that was filed more than six months after the conduct alleged in the charge, on the ground that a separate complaint was pending before the Board. *Nickles Bakery* and *Redd–I* do not address the propriety [of] ignoring the Section 10(b) statute of limitations and initiating multiple actions because a separate timely action was filed against an employer. By allowing the General Counsel to prosecute the underlying ULP complaint, the Board is improperly expanding its jurisdiction beyond that authorized by Section 10(b) of the Act.

DNA Supp.Mem. at 4.

Hence, the parties' positions can be summarized as follows: The NLRB believes that under the "closely related" doctrine, whether untimely ULPs are filed by amending an existing complaint or by filing an entirely new complaint, is a distinction without a difference. Taking the contrary view, DNA asserts that the distinction is the crucial difference, and though it may be lawful under § 10(b) to amend a timely existing complaint with an untimely amendment that is "closely related,"[5] it is absolutely unlawful for the Board to file a new complaint that is untimely under § 10(b), regardless of whether the complaint contains charges "closely

---

**5.** It bears repeating that DNA expressly contests the legality of the "closely related" doctrine, but asserts that even the doctrine it is a

lawful interpretation of § 10(b), it is utterly inapplicable to the filing of an untimely new complaint.

related" to a different complaint that was timely filed.

██ "The starting point for interpreting a statue is the language of the statute itself." *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 25, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) (internal citation and quotations omitted). Under the express terms of § 10(b), DNA is clearly correct. The statute provides that, *"no complaint* shall issue based upon any unfair labor practice occurring more than six months prior to the filing of a charge with the Board." It does not say "no complaints except for those consisting of charges closely related to another complaint that was timely-filed shall issue . . [.]" The phrase "no complaint" means nothing more, and nothing less, than "no complaint." By its terms, Section 10(b) explicitly proscribes the issuance of any complaint concerning ULPs occurring more than six months prior to the charge. The language could not be more clear. *See Hallstrom*, 493 U.S. at 26, 110 S.Ct. 304.

By contrast, the statutory language concerning the amendment of complaints admits of a more flexible interpretation: "Any such complaint may be amended by the member, agent, or agency, conducting the hearing or the Board *in its discretion at any time prior to the issuance of the order* based thereon[.]" Hence, so long as a complaint is still being litigated, it may be amended. By its terms, § 10(b) places no explicit restrictions on such amendments; indeed, the Board is expressly given "discretion" in the amendment process. Thus, while the "closely related" doctrine may be a plausible interpretation of the Board's power to amend an existing complaint (an issue not before the court), the express statutory language forbids the application of the doctrine to the filing of complaints, all of which must be timely filed.

6. The consistency is hardly surprising, as Congress made clear its intention in § 10(b) that the Board emulate the procedures of the federal courts: "Any such proceeding shall,

This observation is entirely consistent with the federal rules governing the effect of statutes of limitations on new complaints, as opposed to amended complaints.[6] As explained by one district court:

> Whereas an Amended Complaint does "relate back" to the date of the filing of the original Complaint for purposes of [the] statute of limitations pursuant to the circumstances described in Fed. R.Civ.P. 15(c), a new Complaint filed in a separate lawsuit will not be subject to the doctrine.

*Frilling v. Honda of America Mnfg., Inc.*, 1996 WL 1619348 at *4 n. 11 (S.D.Ohio Oct. 21, 1996) (unpublished opinion). And as noted by the Sixth Circuit, "[w]here the statute that creates a right of action expressly limits the time in which a suit to enforce the action may be brought, time is of the essence of the right and the limitation of the remedy is a limitation of the right." *AMC Mortgage Co., Inc., v. Tennessee Dept. of Revenue*, 213 F.3d 917, 920 (6th Cir.2000) (publication pending) (internal citation and quotations omitted).

██ Put another way, the existence of a prior complaint has no tolling effect on the statute of limitations regarding a subsequently filed complaint concerning the same set of underlying facts. *See, e.g., Cardio–Medical Assoc., Ltd., v. Crozer–Chester Medical Cntr.*, 721 F.2d 68, 77 (3d Cir.1983) ("It is a well recognized principle that a statute of limitations is not tolled by the filing of a complaint subsequently dismissed without prejudice. As regards the statute of limitations, the original complaint is treated as if it never existed."). The NLRB's argument that DNA was put on notice of the charges underlying the instant complaint by the Board's previous (unsuccessful) attempts to amend the prior timely complaint is of no moment: The "fact that defendants may have been on

so far as practicable, be conducted . . . under the rules of civil procedure for the district courts of the United States[.]"

notice as to plaintiff's cause of action does not toll the running of the statute [of limitations]; only the [ ]filing of the complaint within the statutory period could have done that." *Williams v. Vaughn*, 3 F.Supp.2d 567, 578 (E.D.Pa.1998) (internal citation and quotations omitted).

It appears to be the Board's position that it would elevate form over substance to permit untimely charges to be filed through amendments to an existing complaint, while prohibiting untimely charges in the form of new complaints. Even if that observation were true, the Supreme Court has held that where Congress has established express statutory procedures, the courts are not at liberty to create exceptions, even where the exceptions would merely permit the same results already functionally permitted by the statute when the proper procedures are followed. *See Hallstrom*, 493 U.S. at 26–27, 110 S.Ct. 304.

But this is not a procedural distinction without a difference. Even under the Board's "closely related" interpretation of § 10(b), the General Counsel is limited to attaching untimely charge amendments to a *timely-filed complaint*. While this theory permits a considerable amount of bootstrapping, it at least constrains the Board to bringing its claims within a timely-filed piece of litigation that will eventually come to an end. The same is true of amended complaints filed in the federal courts. By contrast, and as DNA points out, permitting the Board to apply the "closely related" doctrine to new complaints would make § 10(b) all but a nullity. So long as the Board filed at least one timely charge, it could prosecute ULPs under the "closely related" doctrine *ad infinitum*. To accept the Board's position is to conclude that § 10(b) not only does not mean what it says, but that it means nothing at all. This was precisely the position advocated by the Board in *Local Lodge* —a position resoundingly rejected by the Supreme Court. *See* 362 U.S. at 422, 425, 80 S.Ct. 822.

Therefore, based on the unambiguous mandatory language of § 10(b), it is clear that *any* complaint based upon any ULP occurring more than six months prior to the filing of a charge with the Board is time barred, even if the underlying charges are "closely related" to charges that were timely filed with the Board. Under *Leedom*, the district court has the power to prevent the NLRB from engaging in activities that are expressly prohibited to it by statute, and the court will exercise that power here.

## VII. Conclusion

The Supreme Court held in *Leedom:*

This Court cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers. Where, as here, Congress has given a right [ ], it must be held that it intended that right to be enforced, and the courts to encounter no difficulty in fulfilling its purpose.

358 U.S. at 190–91, 79 S.Ct. 180 (internal citations and punctuation omitted). Through § 10(b) of the NLRA, Congress has given employers the unambiguous right to be free from the prosecution of stale ULPs. Because the statutory language of this statute of limitations is express and mandatory, and vests the NLRB with no discretion in the matter, it is a right enforceable in this court.

However, the matter does not end there. The court observes that the ULPs contained in the July 19, 1999 Consolidated Complaint are disparate treatment claims. The court further notes that § 10(b)'s six-month limitations period accrues from the date a plaintiff discovered or reasonably should have discovered the act constituting the alleged ULP. *See Nida*, 7 F.3d at 525. There is no information in the record indicating when the charging parties to the ULPs underlying the instant Consolidated Complaint discovered or should have discovered the purported disparate treatment. The court observes that the es-

sence of a disparate treatment charge is not merely that one has been poorly treated, but that one has been treated differently than a comparable other for substantially the same conduct. Hence, the ULPs contained in the Consolidated Complaint did not accrue until those parties knew or reasonably should have known of the supposed disparate treatment, *see id.*, and the statute of limitations for filing a charge with the Board did not expire until six months thereafter.

Whether and when a given charging party knew or should have known of a disparate treatment ULP is a mixed question of law and fact that this court does not have jurisdiction to consider. The court does not know whether the NLRB and DNA agree or disagree (or even know) as to when the underlying claims accrued.

However, it is beyond cavil that the Board may not prosecute any ULP charges filed more than six months after they accrued; such claims are "extinguished" under § 10(b). Accordingly,

IT IS ORDERED that the NLRB's "Motion to Dismiss Complaint" is DENIED.

IT IS FURTHER ORDERED and DECLARED that any unfair labor practice charges contained in the July 19, 1999 Consolidated Complaint issued by the NLRB Regional Director based upon charge numbers 7–CA–40759, 7–CA–40943, and 7–CA–40944, are barred by § 10(b) of the NLRA, 29 U.S.C. § 160(b), to the extent that the charging party filed the charge with the NLRB more than six months after the charging party knew or reasonably should have known of the unfair labor practice.

IT IS FURTHER ORDERED that the NLRB, its Regional Director, its General Counsel, and any other officers or agents thereof, are hereby ENJOINED from prosecuting against the Detroit Newspaper Agency and The Detroit News, Inc. any complaint based upon any unfair labor practice occurring more than six months

prior to the filing of a charge with the NLRB.